# CASES DETERMINED

## August Term,. 1875.

STATE ex rel. WOOD vs. BAKER.   STATE ex rel. KING vs. KROMER.

| | |
|---|---|
| 38 | 71 |
| 83 | 120 |
| 83 | 159 |
| 38 | 71 |
| 86 | 647 |
| 38 | 71 |
| 107 | 180 |
| 38 | 71 |
| 114 | c406 |
| 38 | 71 |
| 115 | c611 |

QUO WARRANTO: TITLE TO OFFICE: ORIGINAL JURISDICTION OF SUPREME COURT.  (1, 5) *General views as to jurisdiction of this court.*  (2, 3) *When this court will take original jurisdiction to try title to a local office.*  (4–7) *The proceeding here must be by criminal information of attorney general.* ·(8) *Amendment to change the form of the action.* (14) *Penalty for usurpation: Fine imposed.*

ELECTIONS: REGISTRY LAW.  (9, 10) *How far registry law valid.*  (11, 12) *Register* de facto. *Rights of electors whose names are thereon. Case stated.*

COUNTY CANVASSERS.  (13) *When bound to send for corrected returns.*

1. The views expressed in *Attorney General v. Eau Claire,* 37 Wis., 400, as to the original jurisdiction of this court, and the cases for its proper exercise, reaffirmed.

2. Under ordinary circumstances this court will not take original jurisdiction to try the title to a county office.

3. But where a contest as to the right to a county office under a certain election involved questions affecting to some extent the right of the judge of the circuit court of the county to a high office for which he had been a candidate at the same election: *Held,* that the original jurisdiction of this court should be exercised for the determination of such controversy.

4. It is only in the interest of the state at large, in its sovereign character, that this court ought to exercise jurisdiction in such cases; and the proper proceeding is an information of the attorney general as the law officer of the state.

5. The information in the nature of a *quo warranto*, of which jurisdiction is conferred on this court by the constitution, is a *quasi* criminal proceeding; and while the legislature could give a *quasi* civil proceeding in such cases, it could not abolish such *quasi* criminal jurisdiction of this court. An intimation in *Attorney General v. Messmore*, 14 Wis., 115, bearing upon this point, criticised.

6. Sec. 6, ch. 160, R. S., provides for an information in the nature of a *quo warranto*, by the attorney general, either *ex officio* or upon the relation of a private person; and it also gives a new proceeding in the nature of a civil action by a private party, though in the name of the state, without any use of the attorney general's name or office, in cases of local offices and in all cases where the attorney general refuses to act.

7. While this court has original jurisdiction of *all* cases in the nature of a *quo warranto*, it will not exercise such jurisdiction of a *quasi* civil action, in the name of the state, on the complaint of a private person, for a local office. *State ex rel. Peacock v. Orvis*, 20 Wis., 235, as to this point, overruled.

8. This court, having permitted the present cases to be commenced here, without observing that in neither of them were the summons and pleading signed by the attorney general, or that in neither was the pleading in the form of an information, now, upon motion of the relator in each case, and upon his filing the written consent of the attorney general, orders that such relator have leave to change the form of the pleading to that of an information, and that the attorney general have leave to sign the summons and pleading. Such an amendment is authorized by the statute (R. S., ch. 125, sec. 37), being in furtherance of justice, and to correct a mistake not affecting the issue.

9. The constitution of this state (sec. 1, art. III) prescribes the qualifications of electors; and statutes cannot impair the right of one possessing those qualifications, though they may require proof thereof, consistent with the right itself.

10. The registry law of this state is valid, so far as it provides for a register of qualified electors to be made in the manner therein prescribed, and constitutes such register one mode of proof of the elector's right, and so far, also, as it requires of an elector whose name is not upon such register, to make other reasonable proof of his right, to the inspectors of the election, at the time of offering his vote.

11. Voters whose names are on a register *de facto*, used by the inspectors of an election as official and valid, need not inquire whether such register was made in the manner prescribed by law; and their right to vote at such election cannot be impaired by the facts that such

register was not legally made, and that, not being otherwise challenged, they did not furnish other proof of their right.

12. At the general election in 1874, there were registers *de facto* of the voters, used as official and valid by the inspectors at five election precincts in Wood county; and it does not appear that the voters whose names were on them had any notice of irregularities or defects in them, though in fact they were never certified, filed or posted as required by law, and were in other respects defective in substance and form, and not made by the boards of registry under color of compliance with the registry law. The persons named in them (who were all qualified voters) were permitted by the inspectors to vote, and did vote, in their respective precincts, at said election, without the oath or other proof required of nonregistered voters. *Held*, that their votes should be counted in determining the result of the election.

13. Where the returns from an election precinct, made to the county canvassers, are so informal or incomplete that the board cannot canvass them, it is the *duty* of such board to despatch a messenger for corrected returns. Tay. Stats., ch. 7, § 89.

14. The defendant *Baker*, at the time of the election and canvass here in question, was county clerk, and was one of the officials who made the register in one of the said five election precincts, the invalidity of which he sets up, in this action against him, as a ground for rejecting the votes cast in such precinct. The board of county canvassers consisted of said defendant (as county clerk) and two other officials whom he took to his assistance. These rejected the returns from certain election precincts, not for the want of legal registers or the failure of the voters named in the *de facto* registers to make other proof of their right, but for alleged informalities and defects in the returns themselves, not relied on here, and which the board made no effort to have corrected. Through the rejection of such returns, said *Baker* was canvassed into the office of county clerk for the term here in dispute, and the defendant *Kromer* into another county office. The court therefore orders that (after due amendment of the process and pleadings) judgment of *ouster* be entered against both defendants, and that defendant *Baker* be further adjudged to pay a *fine* of $200. R. S., ch. 160, sec. 15.

ACTIONS of *Quo Warranto* for the offices of County Clerk and Register of Deeds of Wood County.

The case of *The State ex rel. Wood v. Baker* was commenced in this court, by summons and complaint, upon leave granted,

State ex rel. Wood vs. Baker.　State ex rel. King vs. Kromer.

January 12, 1875.   The complaint avers, among other things, that at the general election in 1874, the relator and defendant were the only candidates for the office of county clerk in said county, and that the relator received 662 votes, and the defendant 595, giving the former a majority of 67 votes; that the inspectors of elections in the several towns and wards duly canvassed and returned the votes so given, to the county clerk, that office being then filled by the defendant, *Baker;* that the defendant took to his assistance two associate canvassers, both members of the county board of supervisors of said county, and they proceeded to canvass the whole number of votes given for the various offices, and, among others, for that of county clerk; that in such canvass they rejected the returns from the first ward of Grand Rapids and the town of Lincoln, pretending that the said returns were informal and incomplete; that they did not dispatch any messenger to the inspectors who made such returns, made no effort to have such returns corrected, and allowed no opportunity for such correction, but declared the relator to have received 549 votes, and the defendant 558, and thereupon gave a false certificate of election to the defendant certifying as aforesaid.   It is further averred that said returns were rejected on the ground that the *jurat* to the oaths of inspectors and clerks in said ward and town had not been signed, although such inspectors and clerks had been duly sworn by justices of the peace, and the *jurat* had been omitted through inadvertence and mistake.   The complaint also shows that the respondent claimed that there had been irregularities in the registration of electors in certain precincts of said county.   These irregularities were set forth in detail in the answer, and are substantially stated in the opinion of the court.   It is only necessary to add, that the registry lists claimed to have been irregularly made, were taken to the polls on the morning of the day of election, lay upon the table in the usual manner, and were used and referred to by the inspectors as registry lists; and that no person

AUGUST TERM, 1875. 75

State ex rel. Wood vs. Baker.   State ex rel. King vs. Kromer.

voted whose name was not on such lists, and no affidavits were made.

The cause was sent to La Crossé county for trial, on the issues made by the pleadings.   A jury trial was waived, and a written finding of facts, agreed to by the parties, was sent to this court.   In this finding, the objection that the *jurats* to the oaths of inspectors and clerks had not been signed, was waived, and the facts as to the irregularities in registration were recited.

The relator moved for judgment in his favor on the findings, and the defendant moved to dismiss the action for want of jurisdiction.   After these motions had been argued and submitted, the relator moved for leave to amend his pleading so as to change its form to that of an information, and for leave to the attorney general to sign the summons and information; and he filed the written consent of the attorney general to do so.

The history of the case of *State ex rel. King v. Kromer* is similar to that of the former case; and the questions involved in the two cases were almost identical.

*P. L. Spooner* and *Vilas & Bryant*, for relators :

1. This court has original jurisdiction of the cases.   The action of *quo warranto* has been entertained by this court to determine the right to a county office, in about thirty instances. See cases cited under title QUO WARRANTO, 1 Sim. Dig., 689, pl. 6 ; 2 id., 490, pl. 2.   It is a perversion of the spirit and language of the decisions in *Attorney General v. Railway Companies* and *Attorney General v. Eau Claire*, to claim that they destroy a jurisdiction of this court exercised by it during a quarter of a century.   See *Attorney General v. Blossom*, 1 Wis., 317, which is expressly approved in the railway cases.   The writ of *quo warranto* is not at all a private remedy to recover an office.   It is an inquiry on behalf of the state into the alleged usurpation of public functions by the defendant; and if he is guilty he may be fined and ousted.   It is only an incident that the office may be awarded to the relator; the public in-

jury is the primary consideration. Tay. Stats., 1812, § 21 ; id., 1811, § 16 ; *Attorney General v. Blossom*, 1 Wis., 817. 2. None of the cases cited by the respondent hold that a poll will be rejected because the registry, if made, and made honestly, was made informally or not at the required times. Such a case falls within the rule that a voter shall not be disfranchised because of the innocent and honest mistakes of the inspectors. *The People v. Cook*, 8 N. Y., 67 ; *State ex rel. Spaulding v. Elwood*, 12 Wis., 551 ; *Attorney General v. Ely*, 4 id., 420 ; *The People v. Pease*, 27 N. Y., 45, 72. The voter is not chargeable with seeing that the lists are properly made, and he has the right to presume that the officers have done their duty. And it is not required of the voter who finds himself registered, to determine upon the validity of the registration proceedings. It has been repeatedly decided, that where a statute specifies the time within which a public officer is to perform an act regarding the rights and duties of others, it will be construed as directory merely, unless the language, or the nature of the act, shows it an absolute limitation of power. *People v. Works*, 6 Wend., 486 ; *Jackson v. Young*, 5 Cow., 269 ; *Wood v. Chapin*, 13 N. Y., 509 ; *Ex parte Heath*, 3 Hill, 42 ; *State ex rel. Cothren v. Lean*, 9 Wis., 279, 292.

*Minor Strope* and *Powers & Briggs*, with *S. U. Pinney* of counsel, for respondents :

1. There seems to be no reason for taking these cases out of the rule laid down in the case of the *Railway Companies*, and in *Attorney General v. Eau Claire*. And as the objection to the jurisdiction goes to the subject matter, it may be raised at any time. 2. The question as to the constitutionality of the registry law has been already settled by the decisions of this court. It has also been decided that the registry law is imperative in its provisions, and not merely directory. It is entirely immaterial whether the voter supposes that he is registered, or not. *State ex rel. Doerflinger v. Hilmantel*, 21 Wis., 574–578 ; *State ex rel. Bancroft v. Stumpf*, 23 id., 630. The registry law

was passed for the purpose of preventing frauds at elections, and as an additional safeguard to the ones already existing. The want of registration excludes the vote absolutely, unless the affidavit required by the law is made.    From all the provisions of the act it is clear that no registry can be regarded as valid unless it be made or peformed at a *meeting.*    Separate individual acts of a sufficient number to constitute a quorum will not suffice, certainly not of a less number.    *Ross v. Crockett*, 14 La., 811; *Commeyer v. Churches*, 2 Sanf. Ch., 186, 228, 229; A. & A. on Corp., § 504; *Rex v. Great Marlowe*, 2 East, 244; *Battye v. Gresley*, 8 id., 319; *Rex v. Winwick*, 8 Term, 454; *Green v. Miller*, 6 Johns., 38.    So many essential requirements of the law having been omitted, the lists cannot be regarded as registry lists under the law, and any other construction would be utterly subversive of the plain language of what this court has held to be an "imperative statute."

RYAN, C. J.    I. Our views of the original jurisdiction of this court, and of the cases for the proper exercise of it, in *Att'y Gen'l v. Eau Claire*, 37 Wis., 400, were carefully considered and deliberately expressed; and we adhere to them to their full extent.    It was there said :

"To warrant the assertion of original jurisdiction here, the interest of the state should be primary and proximate, not indirect or remote; peculiar, perhaps, to some subdivision of the state, but affecting the state at large in some of its prerogatives; raising ' a contingency requiring the interposition of this court to preserve the prerogatives and franchises of the state, in its sovereign character; ' this court judging of the contingency in each case for itself.    For all else, though raising questions *publici juris*, ordinary remedies and ordinary jurisdictions are adequate.    And only when, for some peculiar cause, these are inadequate, will the original jurisdiction of this court be exercised for the protection of merely private or merely local rights."
" Proceedings to restrain municipal undertakings or municipal

taxation, in ordinary cases, belong appropriately to the original jurisdiction of the circuit, and not of this court. These are questions *publici juris*, as are title to local public office, performance of local official duty, use of local highways, maintenance of local public buildings, abuse of local power or franchise, and kindred local matters. But these are not generally questions directly involving the sovereign prerogative or the interest of the state at large, so as to call for the prerogative jurisdiction of this court. As a rule, no extraordinary jurisdiction is necessary or proper for them ; the ordinary jurisdiction of the circuit court being ample. Practically it would be impossible to take jurisdiction of them all here; and we intend to assume jurisdiction of none of them, which are not taken out of the rule by some exceptional cause. When they are governed by some peculiarity which brings them within the spirit and object of the original jurisdiction of this court, we will entertain them ; otherwise, they will be left to the circuit courts."

These cases, involving title to county offices, would undoubtedly be within the rule forbidding the exercise of original jurisdiction of them here, in ordinary circumstances. And the question arises, whether there is any peculiarity affecting them which brings them within the exception. For it is obvious that the rule stated in *Att'y Gen'l v. Eau Claire* reserves a discretion to the court to exercise original jurisdiction of such cases, when peculiar conditions bring them within the spirit and object of the jurisdiction, or render the jurisdiction of the circuit court inadequate.

Whether the conduct of the county canvassers, presently considered, raises a " contingency requiring the interposition of ' this court," need not be determined. It was upon another ground that we gave leave to bring the cases here, and that we now sustain the exercise of original jurisdiction of them.

When the leave was given, it appeared that the election and canvass involved in these cases were the same that were in

question at the last term in *State ex rel. McDill v. Board of State Canvassers*, 36 Wis., 498, and that the distinguished gentleman who was the judge of the circuit court in which these cases must be brought, if not brought here, was directly interested in the questions involved in them ; his title to a high office depending more or less upon them. The relators not unreasonably objected to bring their cases before him ; and our high respect for him forced us to believe that he would object no less.   He was, perhaps, disqualified in law, he was surely disqualified in propriety, from sitting judicially in these cases ; and we felt warranted in believing that he would refuse to act in them.   The terms of office involved were brief and fast passing away.   We thought then, and hold now, that we could not with judicial propriety subject the relators, or the county whose officers *de jure* they claimed to be, to the partial denial of justice which would arise from the proper refusal of the learned judge of the circuit court to sit in these cases.   For this peculiar cause, the jurisdiction of the circuit court was plainly inadequate.   And indeed, such an obstruction, so caused, of the justice which is a sovereign attribute ; such a defeat, so caused, of timely effect of a constitutional election ; such an interruption of an ordained and radical process by which the sovereignty acts, appears to us to concern the sovereign prerogative, to raise, in Mr. Justice SMITH's words, a contingency requiring the interposition of this court to preserve the prerogative and franchises of the state.   For these reasons, we have no doubt of our duty, within the rule of *Att'y Gen'l v. Eau Claire*, to exercise original jurisdiction of these cases.

II. But it is obvious from what has been said, and still more from the discussions of the original jurisdiction of this court in *Att'y Gen'l v. Blossom*, 1 Wis., 317, *Att'y Gen'l v. R. R. Companies*, 35 id., 425, and *Att'y Gen'l v. Eau Claire*, *supra*, that it is in the public right only, in the interest of the state at large in its sovereign character, that we ought to exercise jurisdiction

in such cases; and that the proper proceeding is therefore by information of the attorney general, as the law officer of the state.

Such was the proceeding in *Att'y Gen'l v. Messmore*, 14 Wis., 115. A question arose in that case on the form of the summons and the frame of the information, which the court held should in such cases conform to the code. As matter of practice, that might perhaps be convenient and proper enough. But the opinion in that case incautiously, and we think unnecessarily, proceeds to hold that the provision of the code that remedies by information in the nature of *quo warranto* might be obtained by civil action, and should be as thereby prescribed, had the effect to make all proceedings in the nature of *quo warranto* civil actions, and to abolish the proceeding by information, as it existed at the time of the adoption of the state constitution. We cannot think that so radical a position was properly involved in the decision of that case; and, with profound deference to the opinion of the very learned and able judge who delivered it, we are compelled to dissent from his position. Indeed, we think it overruled by his later and more advised opinion in *State v. W. W. Railway Co.*, *infra*.

The jurisdiction conferred on this court by the constitution is of informations in the nature of *quo warranto*, as substituted in modern times for the use of the ancient writ itself, and as used when the constitution was framed. *State v. W. W. R'y Co.*, 34 Wis., 197. This was a prerogative proceeding, *quasi* criminal and *quasi* civil in its character, according to its use, but always classed with criminal informations. Bacon's Abr., "Information;" Cole's Crim. Inf., 110–113. The imposition of a fine, though nominal, appears to stamp upon it the essential character of a criminal proceeding.

The mode of proceeding under this jurisdiction might be regulated by statute, but the jurisdiction itself could not be defeated or abridged. This is expressly recognized in *Att'y Gen'l v. Messmore*, as it has always been held by this court.

But the opinion in that case overlooked the consequence of reducing all remedies in the nature of *quo warranto* to mere civil actions, which would take away from this court criminal jurisdiction of such cases, or, more accurately stated, jurisdiction of criminal informations in such cases.   It was undoubtedly competent for the legislature to give a *quasi* civil proceeding in such cases, but not to abolish the *quasi* criminal jurisdiction vested in the court by the constitution.   This appears to us to be matter of substance, not of form.

Sec. 6, ch. 160, R. S., relates to proceedings in the nature of *quo warranto* for usurpation of office; and authorizes the attorney general to bring an action in the name of the state "upon his own information or upon the complaint of any private person."   Interpreted by the constitution and translated into legal phraseology, we take this to mean that, in such cases, the attorney general may file an information in the nature of *quo warranto, ex officio* or upon the relation of a private person. The word "complaint" cannot mean a pleading so called in the code, but seems to be used in a general sense, as a substitute for relation; and the attorney general certainly proceeds *ex officio* when he acts on his own information only.   So far, therefore, we see no material change of the law.   The section, however, goes on to provide that such an action may be brought "in the name of the state, by a private person, on his own complaint, when the attorney general refuses to act, or when the office usurped pertains to a county, town, city or district."   Before such a statute, the courts of the state might perhaps, in proper cases, have authorized proceedings in the name of the attorney general, if that officer wrongfully refused to act, and it was necessary to proceed in his name.   *Att'y Gen'l v. Barstow*, 4 Wis., 567.   Be that as it may, this branch of the section gives a new proceeding by private parties, in the name of the state, without use of the attorney general's name or office, in cases of local office, and in all cases in which that officer may refuse to act.   This proceeding is plainly in the

nature of a civil action, although in the name of the state. 3 Black. Com., 263.

And so the statute plainly distinguishes between a criminal information by the attorney general and the *quasi* civil remedy which it gives to a private person. The distinction seems to be founded on the previous uses of the proceeding by information, sometimes of a criminal and sometimes of a civil nature. We think the distinction a proper one, necessary to reconcile the statute with the constitution. And the civil remedy given in cases of local office is in striking harmony with all that is said on the subject in *Att'y Gen'l v. Eau Claire*, although the statute was not then within our attention.

In *State ex rel. Peacock v. Orvis*, 20 Wis., 235, it was held that this court would exercise original jurisdiction of a *quasi* civil action under this section, in the name of the state, on the complaint of a private person, for a local office. But it is apparent that this is one of numerous cases of original jurisdiction which must be considered overruled by *Att'y Gen'l v. Eau Claire*. It seems however to have misled the relators in the cases before the court.

When we granted leave to proceed in these cases, and indeed during the argument of the motions for judgment, we were all under the impression that they were informations in the name of the attorney general. It was only when we examined the records, after the hearing, that we discovered that in neither of them are the summons and pleading signed by the attorney general, or the pleading in the form of an information. And though we held that we ought to exercise original jurisdiction over the subject matter, we were embarrassed by the form of the proceedings.

We therefore suggested the difficulty to counsel on both sides. The relator in each case thereupon moved for leave to change the form of his pleading to that of an information, and for leave to the attorney general to sign the summons and in-

formation; filing the written consent of the attorney general to do so.

The statutory discretion of amendment is very broad. Sec. 37, ch. 125, R. S. It authorizes amendments, before or after judgment, in furtherance of justice, of all mistakes, when the amendment does not substantially change the issue. It seems very certain that the amendment which the relators have asked to make, is in furtherance of justice, to correct a mistake not affecting the issue. The parties, the subject matter, the object of the proceeding, will remain unchanged. It is strictly one of form, not of substance. The difficulty to be cured by the amendment might perhaps be considered ' waived by the defendants. *Attorney General v. Messmore, supra.* It is not jurisdictional; the jurisdiction resting on the facts, though the facts are defectively presented in form. The court has jurisdiction of all proceedings in the nature of *quo warranto*, although it is the duty of the court to restrict the exercise of the jurisdiction, in its discretion, to cases affecting the state or its prerogatives, and therefore to require the attorney general to appear. It is only a change of attorneys and of the technical form of aver-ment in the pleading, which the amendment seeks. We can therefore see no application of such cases as *Whitney v. Bru-nette*, 15 Wis., 61, or *Fairchild v. Dean*, id., 206. And we cannot think that we would be justified in driving these parties to proceed *de novo*, by refusing so formal an amendment. Orders will therefore be entered allowing the amendments to be made.

III. The title of the relators and the defendants in these cases to the offices which they respectively claim, rests on the validity or invalidity of the votes cast, at the election in question, in the two wards of Grand Rapids and the three wards of Centralia; the only objections to the validity of these resting on noncompliance with the registry law, ch. 445 of 1864, as amended.

In the first ward of Grand Rapids, the inspectors of election

did not meet or make any list of voters, as a board of registry; but used at the election, as a register of the voters, a single list of names of voters, without their residences, prepared by one of themselves and the county clerk, which had not been certified, filed or posted as required by law.

In the second ward of Grand Rapids, the inspectors met, as a board of registry, three weeks before the election, and made a duplicate list of the names of voters without their residences, not certified, filed or posted as required by law; did not meet again; but used the lists so made, at the election, as a register of the voters.

In none of the wards of Centralia was there any meeting of the inspectors, as boards of registry. But, a few days before the election, some of the inspectors from each ward, the mayor and clerk, had a meeting and made lists of the names of voters for each ward, without their residences, not arranged alphabetically, certified, filed or posted, as required by law, but used by the inspectors, at the election, as registers of the voters.

Persons whose names were on these five lists respectively were permitted by the inspectors to vote, and voted, in their respective wards, at the election, without oath or proof required from nonregistered voters, precisely as if the lists had been regular and valid registers of the voters, duly made, certified, filed and posted as required by law.

There is no suggestion, however, that any persons, not otherwise legal voters in their respective wards, voted in them at the election.

It is of course quite manifest that the inspectors of election failed in their duties, as boards of registry, and that the lists which they used at the election, in all these wards, as registers of voters, were defective in substance and form, and were not made by them under color of compliance with the registry law. And the question is, whether such official nonfeasance and malfeasance of the inspectors of election can operate to disfranchise legal voters without notice and without fault.

We say, without notice and without fault : for none appears affirmatively in these cases.   And we cannot think that in such circumstances voters are chargeable with constructive notice of the failure of duty by the inspectors, or of the irregular or defective character of the registers *de facto* used by the inspectors at the election ; or in default for not qualifying themselves as nonregistered voters, when they find themselves *de facto* registered on actual registers, used as official, regular and valid, by the inspectors, at the election.

It is true that the registry law provides for great publicity of the process of registry and of the registers themselves, throughout the process ; and fully authorizes voters to examine and criticise the registers and propose corrections of them, during the process of registry.   So much so, that it is said in *State v. Hilmantel*, 21 Wis., 566, that every voter is made or may become an agent in the execution of the law ; and added, that in case of a voter whose name has been omitted, the burthen of answering the requirements of the law by furnishing affidavit and proof is thrown upon the voter himself, who is presumed to know the law and to go to the polls prepared to comply with its conditions.   And in *State v. Stumpf*, 23 Wis., 630, the same rule is applied to elections where there is no register of voters at the election.   But all this implies notice to voters that their names are not on the register, or that there is no register *de facto*, at the election ; so that they have an opportunity, if they will, to remove the difficulty, each voter for himself, by complying with the statutory conditions.   In such case, if a voter be disfranchised, he is by his own omission a voluntary party to his disfranchisement.   But that cannot be said where the inspectors have a register *de facto*, which they use as official and valid, on which the voter's name is found, and of whose irregularities and defects he has no notice.

In the two cases in this court just cited, the registry law was assumed without discussion to be constitutional.   We have no disposition to question the construction given to the statute in

State ex rel. Wood vs. Baker.   State ex rel. King vs. Kromer.

either of these cases, or its constitutional validity. But it is our duty to give it such a construction, if we can, as will make its provisions fully accord with the constitutional right of suffrage.

The constitution vests every person having certain qualifications at the time of any election with the right of suffrage at such election. Some of these qualifications rest on time which may ripen, or facts which may accrue, on the very day of election. So that one may well become vested with the right of franchise pending the election, who was not so vested before, or perhaps entitled to be registered at the time of registry. So one entitled to the franchise may be sick, or absent or imprisoned, or otherwise disabled, at the time of registry. But the constitution vests and warrants the right at the time of election. And every one having the constitutional qualifications then, may go to the polls, vested with the franchise, of which no statutory condition precedent can deprive him. Because the constitution makes him, by force of his present qualifications, "a qualified voter at such election." Art. III, sec. 1. Statutes cannot impair the right, though they may regulate its exercise. Every statute regulating it must be consistent with the constitutionally qualified voter's right of suffrage when he claims his right at an election. Then statutes may require proof of the right, consistent with the right itself. And such we understand to be the theory of the registry law; "to guard against the abuse of the elective franchise, and to preserve the purity of elections;" not to abridge or impair the right, but to require reasonable proof of the right. It was undoubtedly competent for the legislature to provide for a previous registry of voters, as one mode of proof of the right; so that it should not be a condition precedent to the right itself at the election, but, failing the proof of registry, left other proof open to the voter at the election, consistent with his present right. So the legislature could provide for challenges of voters at the election, and for the oath or proof necessary to them to assert their

State ex rel. Wood vs. Baker.    State ex rel. King vs. Kromer.

right against challenge.   And this we take to be the exact effect of the registry law as already construed by this court. If a voter's name be not on the register at an election, he is in effect challenged by the statute, and required to furnish prescribed proof of his right.   If there be no register at an election, the statutory challenge goes to all the voters ; they must furnish the requisite proofs of right.   These requirements are not unreasonable, and are consistent with the present right to vote, as secured by the constitution.   The statute imposes no condition precedent to the right ; it only requires proof that the right exists.   The voter may assert his right, if he will, by proof that he has it ; may vote, if he will, by reasonable compliance with the law.   His right is unimpaired ; and if he be disfranchised, it is not by force of the statute, but by his own voluntary refusal of proof that he is enfranchised by the constitution.

But if he were such an agent in the execution of the registry law as to be responsible in his right of suffrage for its nonfeasance or malfeasance ; if he were bound to see to the putting of his name and residence on the register, or charged against his right with irregularities or defects of the register, so as to impair his right of suffrage at the election, it might be impossible to sustain the registry law under the constitution.   But we cannot think that such is a necessary or even an admissible construction of the statute.

And if failure or error in duty of the inspectors, of which voters have no notice in fact, could operate directly or indirectly to disfranchise voters at the election, we should encounter the same difficulty in sustaining the statute under the constitution.   Nonfeasance or malfeasance of public officers could have no effect to impair a personal, vested, constitutional right.   We see no such purpose in the registry law. Surely it would be a strange attempt to protect the elective franchise and preserve the purity of elections, to put it in the power of inspectors of election, by careless accident or corrupt

design, to disfranchise constitutional voters. That, we take it, would be the actual effect of avoiding elections where the inspectors use defective or irregular registers at the election, as official and valid; so entrapping voters into dispensing with proof of their right, required and authorized only when their names are not registered at the election. We cannot think that such is a necessary or admissible construction of the statute.

Undoubtedly the statute authorizes a large supervision of the process of registry by voters, and voters may so supervise the process as to be fully advised of all irregularities and defects. But all such supervision is voluntary. The statute does not impose it as a duty, or as a burthen on the right of suffrage, and could not. The statute must be so construed as to reconcile all its provisions to the unimpaired, unincumbered right of suffrage at the election. And we think that such is its obvious construction.

It was said upon the argument that the voters whose names were on the registers in the several wards in question were bound to inspect the registers and to discover their apparent defects. We cannot think so. We need not pass upon the questions whether voters, at an election, have a right to inspect the registers used, or whether notice of defects of form in the registers would impair the right to vote without proof. Because we hold that voters are not bound to examine the registers, if they can, as a condition precedent to voting without proof; and that voters whose names are on a register *de facto*, used by the inspectors at the election as official and valid, need not inquire further. They may accept the registers *de facto*, as they accept the inspectors *de facto*. And they are no more bound to inquire into the qualifications *de jure* of the registers than into the qualifications *de jure* of the inspectors. It is enough for voters to find at the election acting inspectors using actual registers *virtute officii*. They need look no further to see if their votes be challenged by statute. The statute can-

not challenge them without notice.    Their constitutional right cannot be baffled by latent official failure or defect.    And the registry law sets no such trap, authorizes none such, for the constitutional right which it was passed to protect.

In these five wards, there were registers *de. facto* of the voters, used by the inspectors at the election, as official and valid under the law.    The voters whose names were on them do not appear to have had any notice of irregularities or defects in them.    They appear to have come to the polls to vote, and to have voted, in good faith, without any sort of warning that proof of their right to vote was required by law.    The facts are wholly unlike those in the cases of *Hilmantel* and *Stumpf*.    It would be a fraud on the constitution to hold them disfranchised without notice or fault.    They went to the election clothed with a constitutional right of which no statute could strip them, without some voluntary failure on their own part to furnish statutory proof of right.    And it would be monstrous in us to give such an effect to the registry law, against its own spirit and in violation of the letter and spirit of the constitution.

The votes cast in these wards should therefore be counted in the election.    And the relators therefore appear to have been duly elected to the offices which they respectively claim.

IV.    There is nothing to distinguish the case of *Kromer* from ordinary cases of the kind.    Judgment will therefore go in his case in the usual form against him and in favor of the relator.

But the case of *Baker* is very distinguishable from ordinary cases of contest for office.    At the time of the election and canvass, he was county clerk; one of the officials who made the registry of votes in the first ward of Grand Rapids, which he now asks to operate so as to disfranchise at the election all the voters in that ward.    The county canvass was made by him and the two officials whom he took to his assistance to form the board of county canvassers.    Saving the defendant's per-

sonal knowledge of the register in the first ward of Grand
Rapids, it does not appear that the board of county canvassers
had any notice of the irregularities or defects in the register
of voters in these five wards, now urged for the defendant.
Certain it is that they did not, in the canvass, reject the votes
in any of them for any irregularities or defects of the registers.
The defense which the defendant now sets up for his usurpation
of office, appears to have been an after thought, which cannot
mitigate his breach of duty then.   The board of county can-
vassers did reject the returns from the town of Lincoln and
the first ward of Grand Rapids, for alleged illegality and de-
fectiveness, not in the election, but in the returns themselves,
not now relied on by the defendant.   The rejection of these
returns, wholly unauthorized, gave excuse to the defendant
and his associates in the board of canvassers to declare the
defendant himself elected county clerk.   This was a most
indecent and flagrant violation of duty; too palpable for blun-
der, too corrupt for any mercy of construction.   If the returns
from the town and ward were so informal and incomplete — in
the language of the board of canvassers, so illegal and defect-
ive, — that the board could not canvass them, it was the duty
of the defendant and his associates to despatch a messenger for
corrected returns.   Tay. Stats., ch. 7, § 89; *State v. Pierpont*,
29 Wis., 608; *State v. Board of State Canvassers, supra*.   A
county clerk cannot be tolerated in so tampering with his stat-
utory duty; in so baffling the constitutionally expressed will
of the voters of his county, to keep himself in office to which
another is elected, by violation of his official oath and duty.
Speaking of this very canvass, it was said in *State v. Board of
State Canvassers, supra:* "There is nothing in the statement of the
board of county canvassers showing or tending to show, neither
was it claimed on the argument of the demurrer, that any effort
was made to procure corrected returns from the rejected town
and ward.   On the contrary, the silence of their statement on
that subject, the suppression of the nature of the alleged defects

AUGUST TERM, 1875. 91

State ex rel. Wood vs. Baker.    State ex rel. King vs. Kromer.

in such returns, for which they were rejected, and the fact that it does not appear that the board availed itself of the power given by law to adjourn for the purpose of procuring corrected returns, leave upon our minds a most painful impression that the county canvassers utterly neglected their duty in this respect, and illegally and wantonly disfranchised all the electors who voted at such election in the rejected town and ward. If they did so, they committed a most serious offense; an offense which strikes at the very foundations of our system of government, and which cannot be too severely censured. Hence it was that we felt justified in saying, during the argument of the demurrer, that he who, by fraud or by willful disregard of his sworn duty, defeats the will of the people as expressed by their votes, commits a political crime next to treason and near akin to it; and that this court will never fail, on any proper occasion, to characterize such an offense in fitting terms."

The shameful truth, suggested in that case, is apparent in this. Then we could only censure, now we can punish. Sec. 15 of ch. 160, R. S., under which this proceeding is taken, continues the ancient and salutary power of imposing a fine on the usurping officer, in such cases, to the extent of $2,000. Such a statute, in such a case as this, should not be a dead letter. If any defendant in any case of *quo warranto* can earn such a fine, this defendant has earned it in this. It is our duty, now about to be fulfilled, to oust him from an office which he has usurped for one-third of the official term, by willful malfeasance in office, corrupt in fact as in law. And we should feel this court to be, in some sort, his *particeps criminis*, if, in doing so, we should refuse to exercise the power to punish him with which the law intrusts us. Our only doubt on this point has been the proper amount of the fine to be imposed.

This is, so far as we are advised, the first instance of a fine imposed under this statute. And we have been led to think that a fine, moderate in amount, will be sufficient for the punishment of this defendant and for example in such cases. If

the example should prove insufficient, the precedent will not stand in the way of heavier fines in future cases of the kind. The same judgment will therefore go in the case of *Baker* as in the case of *Kromer*, with the addition of a fine against the former of $200.

*By the Court.* — When the amendments now authorized shall have been made to the satisfaction of the court, let judgments be entered in these cases according to this opinion.