LEAGUE OF WOMEN VOTERS OF WISCONSIN EDUCATION
NETWORK, INC. and Melanie G. Ramey,
Plaintiffs-Respondents,†

v.

Scott WALKER, Thomas Barland, Gerald C. Nichol,
Michael Brennan, Thomas Cane,
David G. Deininger and Timothy Vocke,
Defendants-Appellants,

Dorothy JANIS, James Janis, and
Matthew Augustine, Intervenors-Co-Appellants.

Court of Appeals

*No. 2012AP584–AC. Submitted on briefs January 31, 2013.
—Decided May 30, 2013.*

2013 WI App 77

(Also reported in 834 N.W.2d 393.)

† Petition for Review filed.

715

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Thomas C. Bellavia, Carrie M. Benedon*, and *Clayton P. Kawski*, assistant attorneys general, and *J.B. Van Hollen*, attorney general.

On behalf of the intervenors-co-appellants, the cause was submitted on the briefs of *Joseph Louis Olson* of *Michael Best & Friedrich LLP*, Milwaukee, and *Michael T. Morley*, Washington, D.C.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *Lester A. Pines, Susan Crawford*, and *Tamara B. Packard* of *Cullen Weston Pines & Bach LLP*, Madison.

A nonparty brief was filed by *Richard M. Esenberg, Michael Fischer*, and *Thomas C. Kamenick* of the *Wisconsin Institute for Law & Liberty*, Milwaukee, for Margaret Farrow, George Mitchell, Michael Sandvick, Aaron Rodriguez, and Deborah Haywood.

A nonparty brief was filed by *Helen Marks Dicks* of *AARP Wisconsin*, Madison, and *Daniel B. Kohrman* of *AARP Foundation Litigation*, Washington, D.C., for AARP.

A nonparty brief was filed by *Peter E. McKeever* and *Anne Bensky of Garvey McNeil & Associates, S.C.*, Madison, for The Wisconsin Democracy Campaign.

A nonparty brief was filed by *Richard D. Greenlee* and *Dyann L. Hafner*, assistant corporation counsels, Madison, for Dane County.

A nonparty brief was filed by *Lane Fitzgerald* of *The Fitzgerald Law Firm*, Beloit, for The United States Justice Foundation.

Before Lundsten, P.J., Higginbotham and Blanchard, JJ.

¶ 1. BLANCHARD, J. In 2011 Wisconsin Act 23,

the legislature enacted statutes under which, with narrow exceptions, all persons seeking to vote must present one of several specified forms of photo identification to election officials. The League of Women Voters of Wisconsin Education Network, Inc., and its president (the League) sought a declaration in the circuit court that the photo identification requirement is facially invalid under Article III of the Wisconsin Constitution. This case does not present a challenge to the photo identification requirement on any other state or federal constitutional ground. Agreeing with the League, the circuit court entered a judgment declaring that the requirement is unconstitutional and enjoining state officials from enforcing the challenged statutory provisions. The state officials appeal the judgment.[1]

¶ 2. The League makes three primary arguments in support of the circuit court's decision, the second of which is not explicit but strongly implied: (1) the photo identification requirement impermissibly constitutes an "additional qualification" to vote not contained in Article III; (2) the requirement is unconstitutional under the Article III right to suffrage because it imposes a restriction that is on its face so burdensome that it effectively denies potential voters their right to vote, and is therefore constitutionally "unreasonable"; and (3) in creating the requirement, the legislature "exceeded the express authority granted to it" under Article III. The appellant state officials, namely, the governor and the six members of the state Government Accountability Board (GAB), joined by intervenors, contend that the photo identification requirement is constitutional. We conclude that the League fails to

---

[1] This appeal was advanced for decision under Wis. Stat. 809.20 (2011–12). Unless otherwise noted, all references to the Wisconsin Statutes are to the 2011–12 version.

carry its heavy burden of overcoming the presumption that the photo identification requirement is, on its face, constitutional.

¶ 3. First, we conclude that the League's "additional qualification" argument is defeated by concessions the League makes and by Wisconsin Supreme Court precedent addressing the authority of the legislature to enact laws allowing officials to ascertain at the polls which potential voters are qualified to vote. The League has not shown that the photo identification requirement is on its face an "additional qualification" for voting, as opposed to a voter registration regulation that allows election officials "to ascertain whether the person offering to vote possessed the qualifications required." *See State ex rel. Cothren v. Lean*, 9 Wis. 254, [*279], 258, [*283] (1859).

¶ 4. Second, we reject the League's additional, implied argument that the requirement is unconstitutional under the Article III right to suffrage because it imposes a restriction that is, on its face, so burdensome that it effectively denies potential voters their right to vote, and is therefore constitutionally "unreasonable." We express no opinion as to whether such an argument might have merit if supported by fact finding regarding the burdens imposed. However, in this facial challenge in which the League does not rely on any fact finding or evidentiary material, the implied argument falls short.

¶ 5. Finally, as to the argument that, even if the requirement is not an "additional qualification" or constitutionally "unreasonable," the legislature exceeded its authority in enacting it, we conclude that this argument collapses with a concession by the League, which we believe is a warranted concession. The concession is that the legislature has implicit but broad constitutional authority to establish a voting registra-

tion system under which election officials may require potential voters to identify themselves as registered voters, including by requesting photo identification.

¶ 6. Accordingly, we reverse the circuit court's judgment, and remand for further proceedings consistent with this opinion as may be necessary.

## BACKGROUND

¶ 7. As a preliminary matter, we note that a separate constitutional challenge to the photo identification requirement created in Act 23 is currently pending in a different district of this court before another panel of judges, in a case that has been litigated somewhat differently. *See Milwaukee Branch of the NAACP v. Scott Walker*, No. 2012AP1652 (District II). We highlight from the outset that the case before us involves a purely *facial* constitutional challenge based on Article III of the state constitution, and not an *as-applied* constitutional challenge based on any state or federal constitutional provision.[2] There are funda-

[2] In challenging the same 2011 Wisconsin Act 23 provisions, the plaintiffs in *Milwaukee Branch of the NAACP v. Scott Walker*, No. 2012AP1652 (District II), make arguments not made here. In particular, they argue that judicial review of Act 23 requires heightened scrutiny, and they appear to rely on due process and equal-protection-based arguments. Plaintiffs there also make fact-based arguments that the League does not make here. For example, the plaintiffs in the District II case argue that they have demonstrated as a factual matter that enforcement of Act 23's provisions would "severely burden a significant number of qualified voters but [are] not reasonably necessitated or designed to deter fraud or otherwise effect an important government interest." They assert that they have shown that "over 300,000 Wisconsin electors lack an acceptable photo ID" and that "procuring a DMV Photo ID can be a frustrating, complex, and time-consuming process." In contrast, here the-

mental differences between facial and as-applied constitutional claims.

League relies on no such evidence on these topics and challenges the photo identification requirement only under Article III of the state constitution.

We note that, in this case, amici curiae Dane County and The Wisconsin Democracy Campaign submitted limited evidentiary materials below in the form of four affidavits. Those affidavits, if admissible and credited, would support a conclusion that the photo identification requirement presents meaningful burdens to at least some voters. However, the League does not rely on these evidentiary materials in its arguments, nor in any way suggest that the materials create a factual dispute preventing summary judgment. On the contrary, by declining to rely on these materials, the League's arguments implicitly disavow the possibility that such materials might be pertinent to the League's facial challenge to the photo identification requirement under Article III. We further note that the circuit court referenced these evidentiary materials but concluded that the state officials "correctly observe that this court may not rely on this evidence in deciding plaintiffs' purely facial challenge to Act 23's constitutionality." As far as we can discern, the League does not take issue with the circuit court's conclusion on this point. For all of these reasons, we do not rely on the evidentiary materials and take no position on whether such materials could be considered in a facial challenge like the League's or in a facial challenge under some other constitutional provision.

In the same vein, given the League's limited arguments in this case, we make note of, but see no reason to discuss further, the United States Supreme Court's split opinion addressing a facial challenge, under the federal constitution, to an Indiana law requiring photo identification to vote. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 187, 189, 200 (2008). *Crawford* involved allegations that the Indiana law "substantially burdens the right to vote in violation of the Fourteenth Amendment [of the U.S. Constitution]; that it is neither a necessary nor appropriate method of avoiding election fraud; and that it will arbitrarily disenfranchise qualified voters who do not possess the required identification and will place an

722

> A party may challenge a law . . . as being *unconstitutional on its face.* Under such a challenge, the challenger must show that the law cannot be enforced "under any circumstances." If a challenger succeeds in a facial attack on a law, the law is void "from its beginning to the end." *In contrast, in an as-applied challenge,* we assess the merits of the challenge by considering the facts of the particular case in front of us, "not hypothetical facts in other situations." Under such a challenge, the challenger must show that his or her constitutional rights were actually violated. If a challenger successfully shows that such a violation occurred, the operation of the law is void as to the party asserting the claim.

*State v. Wood,* 2010 WI 17, ¶ 13, 323 Wis. 2d 321, 780 N.W.2d 63 (emphasis added) (citations omitted).

¶ 8. The League argues exclusively that, as written, the photo identification requirement is unconstitutional on its face under Article III of the state constitution. The League does not develop any argument or rely on any evidence, expert or otherwise, establishing the anticipated effects of the requirement on particular persons or groups.

¶ 9. Having made that fundamental distinction, we turn to the relevant constitutional and statutory provisions and the procedural history of this facial challenge.

### Relevant Constitutional Provisions

¶ 10. The League invokes two of the three sections of Article III of the constitution: Sections 1 and 2.[3] Article III is entitled "Suffrage."

---

unjustified burden on those who cannot readily obtain such identification." *Id.* at 187. A plurality of the Court concluded that the evidence in the record was insufficient "to support a facial attack on the validity of the entire statute." *See id.* at 189.

[3] Unless otherwise specified, all references in this opinion to "the constitution" or "constitutional" refer to the Wisconsin Constitution.

¶ 11. Section 1 is entitled "Electors." It defines the term "qualified elector" which is synonymous with qualified voter. We will sometimes call this the "Article III qualified voters section." It provides: "Every United States citizen age 18 or older who is a resident of an election district in this state is a qualified elector of that district." WIS. CONST. art. III, § 1.

¶ 12. Section 2 addresses topics on which the legislature "may" enact statutes implementing the right to suffrage of qualified voters. It is entitled "Implementation." We will sometimes call this the "Article III implementation section." In reciting the text now, we italicize the subsection most relevant to arguments made on appeal:

Laws may be enacted:

(1) Defining residency.

(2) *Providing for registration of electors.*

(3) Providing for absentee voting.

(4) Excluding from the right of suffrage persons:

(a) Convicted of a felony, unless restored to civil rights.

(b) Adjudged by a court to be incompetent or partially incompetent, unless the judgment specifies that the person is capable of understanding the objective of the elective process or the judgment is set aside.

(5) Subject to ratification by the people at a general election, extending the right of suffrage to additional classes.

WIS. CONST. art. III, § 2 (emphasis added).

## Relevant Statutory Provisions

¶ 13. We next turn to the most pertinent statutory provisions, both those that existed before Act 23, and those created by Act 23.[4] There appears to be no disagreement between the parties about the meaning of relevant statutory provisions.

¶ 14. Both before and after enactment of Act 23, every person seeking to vote "shall register" to do so "before voting in any election," with exceptions not relevant to this appeal. WIS. STAT. § 6.27 (2009–10); WIS. STAT. § 6.27. Thus, for example, it was before and remains the law under Act 23 that, while "same day" registration at polling places is permitted, a potential voter must register before casting a ballot. *See* WIS. STAT. § 6.55(2) (2009–10); WIS. STAT. 6.55(2).

¶ 15. Election officials compile registration information into "poll lists" for use at polling places, containing "the full name and address of each registered elector." WIS. STAT. § 6.36(2) (2009–10); WIS. STAT. § 6.36(2).[5] Thus, poll lists memorialize who is registered to vote in a given election in a given voting district and they play a critical role in the voting process both pre- and post-Act 23. When a potential voter arrives at

---

[4] 2011 Wisconsin Act 23 creates, repeals, renumbers, and amends numerous statutes located in several chapters of the Wisconsin Statutes.

[5] We recognize that our generic use of the phrase "election officials" often blurs distinctions created by statutes over the years among such officials as members of and employees of the Government Accountability Board (or its predecessor agencies), poll workers, municipal clerks, inspectors, registration deputies, and local boards of election commissioners. However, no party calls our attention to any distinction among types of election officials that matters here, and therefore we use the generic reference.

the polling place for his or her residence in a given election, he or she "shall state his or her full name and address" to election officials, who "shall verify that the name and address" provided match the name and address on the poll list. WIS. STAT. § 6.79(2)(a) (2009–10); WIS. STAT. § 6.79(2)(a).

¶ 16. Thus, it was the law before Act 23, and remains the law under Act 23, that a potential voter is obligated to self-identify to election officials by, at the least, stating his or her name and address, so that election officials can locate the name and address on a poll list for the appropriate voting district in that election.

¶ 17. We finally note, as part of the basic statutory scheme, the existence of procedures that allow for disqualifying voters and challenging the registration of a registered voter. *See* WIS. STAT. §§ 6.325, 6.48 (2009–10); WIS. STAT. §§ 6.325, 6.48. Both before Act 23 and now continuing under Act 23, following a challenge, election officials may, if they deem it necessary, place a challenged voter under oath "to answer any question necessary to determine the challenged elector's qualifications" to vote. *See* § 6.48(1)(b) (2009–10); § 6.48(1)(b).

¶ 18. We now turn to the challenged provisions. Act 23 alters voting procedures to require that, after stating his or her name and address, the potential voter shall:

> present to the officials *proof of identification.* The officials shall verify that the name on the proof of identification presented by the elector conforms to the name on the poll list or separate list and shall verify that any photograph appearing on that document reasonably resembles the elector.

726

WIS. STAT. § 6.79(2)(a) (emphasis added).[6] "Proof of identification" is also required under Act 23 to obtain an absentee ballot. *Compare, e.g.,* WIS. STAT. § 6.86(1)(ar) (with exceptions not relevant, clerk shall not issue absentee ballot unless elector presents proof of identification) *with* WIS. STAT. § 6.86(1)(ar) (2009–10) (containing no such requirement).

¶ 19. Act 23 defines "proof of identification" and "identification" in ways that generally require a voter to have at least one of nine different types of photo identification:

- "Proof of identification" is "identification that contains the name of the individual to whom the document was issued, which name conforms to the individual's voter registration form, . . . and that contains a photograph of the individual," with exceptions not relevant here. WIS. STAT. § 5.02(16c).

- "Identification," as that term is used within the phrase "proof of identification," is defined to consist of one of nine types of photo identification cards, including a motor vehicle operator's license, a state identity card, or a passport. WIS. STAT. § 5.02(6m).

¶ 20. The "proof of identification" requirement operates as follows. Potential voters need a form of identification, but do not need the new "proof of identification," in order to register to vote. Instead, the new

---

[6] The potential voter is also required, under Act 23, to sign the poll list, WIS. STAT. § 6.79(2)(a), unless unable to do so because of a physical disability. However, the League does not challenge this requirement. Separately, Act 23 exempts some categories of potential voters, such as members of the armed services voting absentee, from the photo identification requirement. *See* WIS. STAT. §§ 6.79(6) and (7), 6.86, and 6.87. However, no party suggests that any aspect of these exceptions is relevant to the constitutional question presented on appeal.

"proof of identification" comes into play at the time a potential voter requests a ballot. *See* Wis. Stat. § 6.34(2) and (3). If a potential voter presents no "proof of identification," or produces "proof of identification" bearing a name that does not conform to one on the poll list or bearing a photograph that does not reasonably resemble the potential voter, then he or she is limited to casting a provisional ballot. Wis. Stat. §§ 6.79(3)(b) and 6.97. Officials do not count a provisional ballot without later "proof of identification." § 6.79(2)(d) and (3)(b). More specifically, a provisional ballot is counted only if the voter presents "proof of identification" at the polling place before the polls close or at the office of the municipal clerk or board of election commissioners no later than 4:00 p.m. on the Friday after the election. § 6.97(3)(a) and (b). Separately, on the provisional ballot, the potential voter must provide "written affirmation" that he or she "is a qualified elector of the ward or election district where he or she offers to vote and is eligible to vote in the election." § 6.97(1).

¶ 21. One form of "proof of identification," a Wisconsin identification card, may be obtained at no cost to any potential voter—or at least no cost for the card itself—through the Wisconsin Department of Transportation if the applicant specifies that he or she is requesting it "for purposes of voting." Wis. Stat. § 343.50(5)(a)3. Obtaining such a card requires proof of date of birth, of identity, and of citizenship. *See generally* Wis. Admin. Code § Trans 102.15 (2013).

## *Procedural History*

¶ 22. In October 2011, in advance of full implementation of the photo identification requirement, the League filed this action for declaratory and injunctive relief, naming the state officials as defendants in their

728

official capacities. The suit names GAB officials because the GAB is responsible for administration of election laws, including those in Act 23. *See* Wis. Stat. § 5.05.

¶ 23. The League moved for summary judgment in February 2012, which resulted in briefing and argument by the parties. As indicated above, the League's summary judgment materials consisted of legal authority and argument, with no evidentiary affidavits.

¶ 24. In a decision and final judgment issued in March 2012, the circuit court granted summary judgment in favor of the League, declared the photo identification requirement unconstitutional, and permanently enjoined "further implementation or enforcement" of the requirement. We reference aspects of the court's decision as relevant to discussion below.

## DISCUSSION

¶ 25. We first briefly explain our standard of review, the burden of proof the League faces, and the methodology for interpreting constitutional provisions. We then explain why the League's three primary arguments fail to demonstrate that the photo identification requirement in Act 23 is unconstitutional on its face under Article III of the state constitution. Our decision is based on the terms of the constitution, prior court interpretations of the constitution, and concessions the League makes that we conclude are warranted. In a final section, we explain why we conclude that additional arguments offered by the League are unavailing.

### Standard of Review

¶ 26. It is undisputed that this case exclusively involves the interpretation of constitutional and statutory provisions, putting aside facts alleged on a standing issue that we do not need to reach.

¶ 27. All aspects of this appeal thus involve legal issues subject to de novo review. *See Metropolitan Assocs. v. City of Milwaukee*, 2011 WI 20, ¶ 21, 332 Wis. 2d 85, 796 N.W.2d 717 (challenges to constitutionality of statutes); *Dairyland Greyhound Park, Inc. v. Doyle*, 2006 WI 107, ¶ 15, 295 Wis. 2d 1, 719 N.W.2d 408 (review of grant of summary judgment); *State v. Hamdan*, 2003 WI 113, ¶ 19, 264 Wis. 2d 433, 665 N.W.2d 785 (interpretation of constitutional provisions and statutes).

### *Presumption of Constitutionality & Constitutional Interpretation Methodology*

¶ 28. As stated above, a challenge that a statute is facially unconstitutional contends that the statute "cannot be enforced 'under any circumstances.' " *Wood*, 323 Wis. 2d 321, ¶ 13. If the challenger succeeds, then "the law is void 'from its beginning to the end.' " *Id.* In other words, the statute was void from its enactment because it necessarily violates one or more constitutional provisions. We now summarize the well-established burden of proof and standards that apply to such a challenge.

¶ 29. "Generally, a challenged statute is presumed to be constitutional," and " 'every presumption must be indulged to sustain the law.' " *Dane Cnty. DHS v. Ponn P.*, 2005 WI 32, 279 Wis. 2d 169, ¶ 16, 694 N.W.2d 344 (citations omitted). This means that the challenging party "bears a heavy burden to overcome the presumption of constitutionality." *Id.*, ¶ 18. Under this heavy burden, the challenger "must demonstrate that the statute is unconstitutional beyond a reasonable doubt." *Id.*

¶ 30. As referenced above, there appears to be no disagreement between the parties regarding the meaning of any Act 23 provision, and therefore no need for us to summarize the methodology that applies to statutory construction.

¶ 31. In addressing the arguments of the parties regarding the meaning of Article III, we rely on the following concise summary of constitutional interpretation methodology. We will refer to the factors we italicize here as the *Dairyland* factors:

> The purpose of construing a constitutional [provision] is to give effect to the intent of the framers and of the people who adopted it. Constitutions should be construed so as to promote the objects for which they were framed and adopted. "The constitution means what its framers and the people approving of it have intended it to mean, and that intent is to be determined in the light of the circumstances in which they were placed at the time[.]" *We therefore examine three primary sources in determining the meaning of a constitutional provision: the plain meaning, the constitutional debates and practices of the time, and the earliest interpretations of the provision by the legislature, as manifested through the first legislative action following adoption.*

*Dairyland*, 295 Wis. 2d 1, ¶ 19 (emphasis added) (citations omitted).

## Analysis

¶ 32. Our analysis is organized as follows. We begin by summarizing and discussing concessions the League makes. We then address the League's arguments. First, we address the League's argument that

731

the photo identification requirement impermissibly constitutes an "additional qualification" to vote not contained in Article III. We conclude that it is not an "additional qualification" based on League concessions regarding the meaning of constitutional provisions and Wisconsin Supreme Court precedent. Second, we address the League's implied argument that the photo identification requirement fails an additional test for constitutional "reasonableness." We reject this argument because the League fails to show that the photo identification requirement is on its face so burdensome that it effectively denies potential voters their right to vote, and is therefore constitutionally "unreasonable." Third, we turn to the League's argument that the legislature exceeded its authority under Article III in creating the requirement. We conclude on this issue that the League's concessions, which are consistent with our reading of Article III, resolve this issue against the League. Finally, we explain why the League's remaining arguments are not persuasive.

## League Concessions

¶ 33. We begin with concessions that the League makes, and explain them in some detail, before addressing the League's arguments. We take this approach because we conclude that the legal issues are most easily resolved in light of the League's concessions.

¶ 34. First, the League concedes that the legislature has constitutional authority to "enact the full scope of registration procedures." Second, the League concedes that this constitutional authority to create a voter registration system carries with it a grant of implied authority for the legislature to enact laws requiring potential voters to identify themselves at the polls. In other words, the League acknowledges that the legisla-

ture may constitutionally establish a voter registration system that includes mechanisms under which all potential voters must identify themselves to officials in order to cast ballots and have them counted.

¶ 35. In a third concession, the League seems to suggest that, as part of a registration system aimed at ascertaining at the polls who is qualified to vote, the legislature could—at least without violating Article III, the only constitutional provision cited by the League—constitutionally enact a law under which election officials *request* photo identification from all potential voters each time they vote, as long as the failure to produce an identification card is not the sole basis for preventing or disqualifying a vote.

¶ 36. We now discuss these concessions in more detail. While the Article III implementation section authorizes the legislature to enact laws on specific voting topics, including as most relevant here, laws "[p]roviding for registration of electors," it does not explicitly authorize the legislature to establish procedures for officials at the polling place to ascertain whether a potential voter has registered and, thus, is included on a poll list. Therefore, under a construction of the implementation section that no one advances here, the legislature would lack constitutional authority to enact a law requiring voters to identify themselves each time they vote. Under such a construction, officials would be obligated to provide a ballot to any person appearing at a polling place and count the ballot when cast. It should be immediately clear, however, that such a narrow construction of Article III would be absurd, because it would undermine registration, which is expressly authorized. Similarly, under such a construction, the legislature would lack authority to create, as it did before and still does under Act 23, procedures

733

under which election officials may place a challenged voter under oath to answer questions about his or her qualifications to vote, or to create the new signature-on-the-poll-list requirement not challenged by the League.

¶ 37. Therefore, disavowing any such absurd, narrow construction, the League in its first concession acknowledges that subsection (2) of the Article III implementation section—which permits the legislature to provide for voter registration—provides for legislative authority to establish, in the League's words, "the full scope of registration procedures." The League explains that this subsection "necessarily encompass[es] the authority" for the legislature to create a system for the registration of qualified voters, producing poll lists used to allow only registered voters to vote.

¶ 38. Further, the League acknowledges that this authority includes at least some power to enact laws that have the effect of limiting attempts to vote by qualified voters. Specifically, the League acknowledges that subsection (2) is one of the subsections in the Article III implementation section "[under] which the legislature may restrict the right to vote." How restrictive any such registration system is allowed to be under the constitution, in the League's view, is established to an important degree by the second concession.

¶ 39. In this second concession, the League acknowledges that, whatever else the legislature might or might not be permitted to do that has the effect of restricting attempts to vote under a voter registration system, it may constitutionally require that officials "determine at the polls" that potential voters are listed on the relevant poll list by requiring them to state their names and addresses each time they vote. This is an acknowledgement that the legislature may constitu-

734

tionally require election officials to give all potential voters the following choice at the polls: identify yourself by name and address when you attempt to vote, or you will be deprived of your constitutional right to vote in this election.

¶ 40. The League observes that this second concession arises "of necessity" from the explicit grant of authority to the legislature, in the Article III implementation section, to enact laws providing for voter registration for the purpose of allowing only qualified voters to cast ballots. This concession begins with the basic proposition that, as the League correctly explains, "Through registration, a voter establishes his or her qualifications to vote." The League further explains:

> As a practical matter, this purpose [of establishing a voter's qualifications to vote through the use of registration] cannot be fulfilled unless the voter gives election officials his name and address at the polls. There is simply no way for election officials to ascertain whether a voter is on the poll list, and therefore registered, unless the voter tells the election officials his name and address.

■

¶ 41. We pause to note that these concessions are entirely consistent with explanations by our supreme court, stated in various ways since at least 1867, that voter "registration prior to an election" is "a legislative imperative" necessary to " 'guard against the abuse of the elective franchise, and to preserve the purity of elections.' " *Town of Washington v. City of Altoona*, 73 Wis. 2d 250, 258, 243 N.W.2d 404 (1976) (quoting *Doerflinger v. Hilmantel*, 21 Wis. 574, [*566], 579, [*572] (1867)). "The purpose is to protect the rights of duly qualified, registered electors, to prevent fraud and

abuse of the elective franchise and to preserve the integrity of the ballot." *Id.* at 259 (citing authority that includes *Cothren*).

¶ 42. The League goes yet further in its concessions. The League suggests in its third concession that the legislature could constitutionally treat potential voters who produce photo identification at the polls differently from those who do not, imposing additional requirements on those without photo identification. "The constitutional defect of the Voter ID law," the League states, "is not that it requires citizens to display photo-identification at the polls." More specifically, the League suggests that the legislature could enact a law under which all potential voters are requested to produce photo identification, as long as failure to produce an identification card is not the sole basis for preventing or disqualifying a vote.

¶ 43. In making this point, the League highlights what it calls a "safeguard" aspect of statutes of some other states. In those states, officials ask potential voters to produce photo identification each time they vote, but if they do not produce the identification they may still in some instances vote, or at least cast a provisional ballot that can be counted, without having to later show photo identification.[7] Thus, the League concedes that the legislature may constitutionally request potential voters to obtain, bring to the polls, and

---

[7] For example, one alternative method the League highlights involves election officials allowing a voter, as under Act 23, to cast a provisional ballot without photo identification. *See* MONT. STAT. §§ 13–13–114(1) and (2). However, unlike under Act 23, in Montana the voter may later provide written documentation other than photo identification, such as a utility bill or bank statement, in order to confirm his or her eligibility to vote. *See* MONT. STAT. §§ 13–13–114(2); 13–15–107. If the voter provides such documentation, and if the voter's signature certifying

display photo identification each time they vote, so long as failure to ultimately produce that identification is not the sole basis preventing a ballot from being counted.

¶ 44. With these concessions in mind, we turn to the three primary arguments the League makes and explain why they are unavailing. We then turn to the League's additional arguments.

### 1. "Additional Qualification" Under the Article III Qualified Voters Section

¶ 45. In addressing the League's first argument, that the photo identification requirement is an "additional qualification," we begin by noting that, apart from some references to the constitutional text, neither the League nor the other parties frame their arguments on this issue in developed arguments relying on the *Dairyland* factors. That is, for purposes of this issue, they do not: develop a text-based argument as to whether the terms "qualified elector" or the closely related concept of a voter "qualification" have established, plain meanings that could be dispositive here; discuss any pertinent constitutional debates and practices; or discuss the earliest interpretations of constitutional provisions by the legislature. Rather, they focus in the main on case law. We take this as an agreement that the case law is the only significant source of guidance as to what constitutes an additional "qualification" under Article III. Accordingly, we, like the parties, focus on the case law in addressing this issue.

---

his or her provisional ballot matches the signature on the voter's registration card, the provisional ballot is counted. *See* MONT. STAT. § 13–15–107(b).

¶ 46. The League argues that the photo identification requirement violates the Article III qualified voters section by imposing an additional qualification to vote. More specifically, according to the League, the photo identification requirement is an additional qualification because the requirement is not one of the listed qualifications in Article III (citizenship, age, and residency within a state election district). The League argues that requiring photo identification "imposes an additional condition to vote on voters who have already established their qualifications to vote by registration." To clarify, the League does not argue that Act 23 requires *proof* of a new qualification. Instead, the League argues that the photo identification requirement represents a new qualification.

¶ 47. The League does not argue that any provision in Act 23 formally disqualifies any person as a voter, as occurs for example under the terms of WIS. STAT. § 6.325. Current statutes provide that a person may be disqualified as a voter only if election officials, addressing a formal challenge, "demonstrate[] beyond a reasonable doubt that the person does not qualify as an elector or is not properly registered." *See* § 6.325 (pre-election disqualification procedures); *see also* WIS. STAT. § 6.48 (challenge to registration procedures); *Logerquist v. Board of Canvassers for Town of Nasewaupee*, 150 Wis. 2d 907, 442 N.W.2d 551 (Ct. App. 1989) (addressing post-election voter eligibility challenges under WIS. STAT. § 9.01 (1987–88)).

¶ 48. Instead, the League's "additional qualification" argument is narrow, in light of the League's concessions. We summarize the argument, which turns on the "safeguard" concept that we refer to above, as follows:

- To guard against the dilution of votes cast by qualified voters, the legislature has implied constitutional authority to enact laws under which all potential voters may be asked to present photo identification for purposes of ascertaining their registration status, and those requests do not in themselves constitute impermissible "additional qualifications";

- However, if laws enacted under that implied authority could result in officials not counting a vote *solely* because a voter does not ultimately produce photo identification, then requesting photo identification constitutes an impermissible "additional qualification."

We now explain, under precedent of our supreme court, why this narrow argument is not tenable. The precedent we will discuss establishes that the legislature does not create an impermissible "additional qualification" when it requires a potential voter to provide proof that he or she is a person who has registered to vote.

¶ 49. The parties cite only three cases in which our supreme court has addressed claims that the legislature enacted a law that created an "additional qualification" to vote beyond those specified in the constitution: *Cothren, State ex rel. Knowlton v. Williams*, 5 Wis. 308 (1856), and *State ex rel. Cornish v. Tuttle*, 53 Wis. 45, 9 N.W. 791 (1881). We begin with *Cothren*.

¶ 50. The pertinent statutes in *Cothren* provided that election officials "shall" examine under oath any challenged voter, and if the voter refused to answer the questions he could not vote. *Cothren*, 9 Wis. at 258–59, [*283–84]. The statutes mandated a series of specific questions that were, in the words of the court, "adapted, in each instance, to the cause of challenge, and calcu-

739

lated to draw out from [the potential voter] the truth as to whether such cause of challenge existed against him or not."[8] *Id.* at 258, [\*283].

¶ 51. The constitutional argument rejected by the court in *Cothren* matches the objection in the instant case, namely, that the procedures "prescribe[d] [by the legislature created] other and different qualifications . . . than those prescribed by the constitution for electors." *Id.* at 257–58, [\*283]. In responding to this argument, the court in *Cothren* first noted that the "searching" questions at issue addressed "only the qualifications required by the constitution; nothing further or different." *Id.* at 258, [\*283]. On this basis, the court concluded:

> This act, therefore, instead of prescribing any qualifications for electors different from those provided for in the constitution, contains only new provisions to enable the inspectors to ascertain whether the person offering to vote possessed the qualifications required by [the constitution], and certainly it is competent for the legislature to enact such. The necessity of preserving the purity of the ballot box, is too obvious for comment, and the danger of its invasion too familiar to need suggestion. While, therefore, it is incompetent for the

---

[8] The questions to be asked, and answered under oath by the potential voter, were on the topics of the potential voter's qualifications: citizenship, residence in state, residence in voting unit, or age. *See* Chap. 85, Acts of 1857, § 13. The statutes also included a catch-all provision under which inspectors "*shall* put *all other questions* to the person challenged, under the respective [qualification categories], *as may be necessary to test* his qualifications as an elector at that election." *Id.* (emphasis added). The court explained that the legislature had revised the statutes in 1857 to provide for these "more searching" questions, after a prior challenge-on-oath statutory scheme "was deemed ineffectual to prevent illegal voting." *State ex rel. Cothren v. Lean*, 9 Wis. 254, [\*279], 259, [\*284] (1859).

legislature to add any new qualifications for an elector, it is clearly within its province to require any person offering to vote, *to furnish such proof as it deems requisite,* that he is a qualif[i]ed elector.

*Id.* at 258, [*283–84] (emphasis added). The court went on to explain that there was no constitutional defect in an absolute bar to voting for anyone who did not furnish such proof, because in that circumstance the vote would be "rejected only because [the potential voter] failed to furnish the proof required by law, showing his right to vote." *Id.* at 259, [*284].

¶ 52. *Cothren,* then, contains a general rule for election law cases addressing constitutionality under a facial "additional qualifications" challenge: whether the challenged requirement or procedure allows election officials "to ascertain whether the person offering to vote possessed the qualifications required." The legislature may impose such requirements or procedures, the *Cothren* court recognized, because the legislature has a legitimate interest in preserving the integrity of elections. The general rule is made especially clear in the *Cothren* court's statement that the legislature may demand "such proof" from potential voters "as it deems requisite" for this purpose. *See id.*

¶ 53. The League attempts to distinguish *Cothren* on two grounds. First, the League points to the fact that the photo identification requirement is not part of a challenge-for-cause procedure, such as was at issue in *Cothren,* but is instead obligatory for *all* potential voters. Based on this difference, the League argues that the photo identification requirement, unlike the challenge-for-cause procedure, "does not provide a means by which election inspectors may ascertain whether a challenged voter possesses the constitutional qualifications to vote." Along similar lines, the League

also argues that, under Act 23, a potential voter who fails to display photo identification "is excluded from voting with *no proof* or finding that the person lacks the constitutional qualifications to vote." (Emphasis added.)

¶ 54. Second, the League argues that the photo identification requirement, unlike the challenged procedure in *Cothren,* is not proof demanded in "a form that any qualified voter could immediately comply with, on the spot, simply by answering . . . questions," and that instead proof of identification "must be obtained before the election."

¶ 55. The first argument is directly undermined by the League's concessions outlined above. An argument that the photo identification requirement does not provide a means to ascertain whether a potential voter "possesses the constitutional qualifications to vote" flies in the face of the League's concession that the legislature may require potential voters to identify themselves by at least some means, so that officials can confirm they are registered, and therefore presumed qualified, to vote. The League fails to identify a distinction that matters under the rule set forth in *Cothren* between the means of identification before and after Act 23.

¶ 56. At best, the League demonstrates that *Cothren* involved a different regulation directed at ascertaining whether a prospective voter was a qualified voter. However, we see nothing in *Cothren* suggesting that a photo identification requirement is an "additional qualification." On the contrary, the pertinent language in *Cothren* supports upholding the requirement as something other than an additional qualification on its face, because the photo identification requirement is plainly a means of ascertaining "whether

the person offering to vote possessed the qualifications required." Moreover, *Cothren* states that "it is clearly within [the legislature's] province to require any person offering to vote, *to furnish such proof as it deems requisite.*" *Id.* at 258, [*283–84] (emphasis added).

¶ 57. We further note that, even if a new proof-of-qualification requirement could be a new Article III qualification, contrary to our explanation above, the League's argument would still be unpersuasive. The League fails to articulate any rule that would distinguish, as different in kind, what the League argues is an inherently not-too-onerous requirement (voter must state name and address) and an inherently too-onerous requirement (voter must obtain and produce photo identification). For this reason, we lack any reasoned basis that supports the League's attempts to distinguish *Cothren*. The League's arguments shed no light on where, along the continuum of onerousness, a given method for ascertaining the identity of a voter becomes an "additional qualification."

¶ 58. The second argument attempting to distinguish *Cothren* is not well developed, but it appears closely related to the argument that the League makes elsewhere in its briefing that requiring photo identification is unconstitutional on its face because it requires "extrinsic documentation of identity." To the extent this argument is offered as a basis to distinguish the general rule articulated in *Cothren*, we see no merit in it.

¶ 59. It could be that the League's "extrinsic documentation" argument proposes a rule that an unconstitutional "additional qualification" exists whenever potential voters are required to produce a document of any kind at the polling place in order to vote. As the League points out, the challenged procedures in *Cothren* did not require potential voters to bring any

document with them to the polls. And, it is no doubt at least slightly more onerous for all voters, and perhaps significantly more onerous for some, to be required to obtain, retain, bring to the polls, and produce up-to-date photo identification than it is not to have to do any of those things. However, the League fails to identify any rationale expressed in *Cothren* or any other relevant authority upon which we could base a rule that requiring production of a document in order to vote is, in all cases, an "additional qualification."

¶ 60. In the alternative or in addition, the League's "extrinsic documentation" argument could be that the required photo identification cards are "extrinsic" in the sense that potential voters must obtain them from, as the League argues, "a separate government agency"—perhaps meaning an agency separate from the GAB or any local election official. This is a process, the League argues "*divorced from any aspect of the voter registration or election procedures*," and that "some citizens" may be able to obtain identification cards only "at considerable expense and inconvenience."

¶ 61. As to the final part of this argument, as we have explained, the League relies on no expert opinion testimony or other type of evidence to demonstrate "considerable expense and inconvenience" to even "some" citizens. This argument therefore does not provide a basis for us to conclude that the photo identification requirement, on its face, does not pass muster under *Cothren* because an unknown number of persons qualified and registered to vote might find it onerous, to greater or lesser degrees, to obtain, retain, bring to the polls, and produce photo identification.

¶ 62. As to the rest of this argument, to the extent that it is developed, it is speculative at best. And, the League does not explain its premise. That is, the League

744

does not explain how, on its face, Act 23's reliance on such agencies as the Wisconsin Department of Transportation to issue identification cards is necessarily more onerous for voters than if the legislature had instead created a new responsibility for the GAB or local election officials to issue photo identification cards for these purposes. As stated above, Act 23 includes a requirement that the Department of Transportation waive its fee for photo identification cards issued to anyone who explains that he or she needs the card in order to vote. In other words, the League provides no basis for us to conclude that it is inherently more onerous for voters to obtain "extrinsic documents," in the sense we now address, than it would be for voters to obtain photo identification cards under a hypothetical system that is in some undefined manner "intrinsic" to the voting regulation process.

¶ 63. We now turn to the two other "qualification" cases discussed in the briefs, *Knowlton* and *Cornish*. These cases are similar to each other and very similar in import. The League suggests that *Knowlton* advances its argument, but we disagree and view *Cornish* as adding nothing to the analysis.

¶ 64. In *Knowlton*, the court held that the legislature impermissibly added a thirty-day town residency requirement "not contained in the constitution, and which is repugnant to its provisions." *Knowlton*, 5 Wis. at 315–16. However, even putting aside the fact that *Knowlton*'s holding was superseded by 1882 revisions to Article III, as the League acknowledges, *Knowlton* appears to confirm, by comparison to the facts here, that the photo identification requirement is not the type of restriction that would constitute an unconstitutional "additional qualification." As the *Knowlton* court observed, the constitution addressed the topic of resi-

dency without referring to any such town residency requirement. *Id.* The court also noted that the legislature may impose various requirements and restrictions on the right to vote, such as by directing the potential voter "to exercise this right only in the town where he resides." *Id.* at 316. This latter provision, the Court emphasized, "does not add to the qualifications which the constitution requires." *Id.*

¶ 65. We are not persuaded that the photo identification requirement here is, on its face, more like a categorical bar to certain classes of potential voters, held to be a "qualification" under *Knowlton*, than it is like a number of voting procedures, including registration requirements, which indisputably would pass muster under *Knowlton* or any other authority the League cites.

¶ 66. The League argues that *Knowlton* stands for a test "that looks to the law's *effect* of disqualifying a qualified elector." However, under the League's proposed test, at least as stated, virtually any requirement placed on voters would be an unconstitutional and impermissible additional "qualification," again contrary to the League's concessions stated elsewhere in its briefing. For example, under the League's proposed test the requirement that voters must be in line at the polling place by 8:00 p.m. on election day would be unconstitutional because it has the effect of "disqualifying," in the League's terms, any person, no matter how qualified and registered to vote, who arrives at 8:01 p.m. *See* WIS. STAT. § 6.78 (regulating poll hours). As the state officials argue, any such argument was foreclosed by the Wisconsin Supreme Court long ago under the authority cited above. For these same reasons, we disagree that the circuit court in this case correctly articulated any constitutional rule that supports its

746

conclusion, on this record, that the photo identification requirement is a "qualification" that "masquerade[s]" as "an election regulation requirement."

¶ 67. *Cornish*, the other case cited by a party in which our supreme court has addressed an "additional qualification" argument, strongly resembles *Knowlton* in all relevant respects and therefore appears to add nothing to the analysis. *See Cornish*, 53 Wis. at 49–51 (citing *Knowlton* as authority to hold that a village charter with a twenty-day residency requirement imposed an additional qualification).

¶ 68. Turning to subsequent supreme court precedent, *Cothren* has been cited with approval on multiple occasions in cases that did not explicitly involve an "additional qualification" argument. *See, e.g., State ex rel. O'Neill v. Trask*, 135 Wis. 333, 337, 115 N.W. 823 (1908) (citing *Cothren* for the proposition that "it devolves on [an unregistered voter] to present proper affidavits showing the facts which entitle him to vote"); *Town of Washington*, 73 Wis. 2d at 259 (citing *Cothren* and other authority for the proposition that the purpose of voter registration "is to protect the rights of duly qualified, registered electors, to prevent fraud and abuse of the elective franchise and to preserve the integrity of the ballot").[9]

---

[9] *State ex rel. O'Neill v. Trask*, 135 Wis. 333, 115 N.W. 823 (1908), contains language that appears to lend support to the arguments of the state officials, but we do not place significant weight on *Trask*. This is because *Trask* could be seen as limited to the topic of what requirements the legislature may impose for purposes of registration, as opposed to what separate requirements the legislature may impose for purposes of voting once registered. *Trask* involved not a requirement merely to state a name or to answer questions, but a requirement to complete an affidavit showing the voter's qualifications when the voter's name had not been enrolled on the applicable voter

¶ 69. The League also attempts to distinguish *Cothren* and subsequent case law predating 1986 on the grounds that revisions to Article III that year superseded this authority. We address and reject that argument in a separate discussion below addressing the League's legislative authority argument.

## 2. League's Implied Constitutional "Reasonableness" Argument

¶ 70. We turn now to an implicit argument by the League. The argument appears to be that, even if the photo identification requirement is not an "additional qualification" under *Cothren*, the requirement is subject to a separate case-law-based test for constitutional "reasonableness," which it fails. While not explicitly argued in these terms, some of the League's arguments necessarily appear to boil down to an assertion that the photo identification requirement, on its face, is constitutionally "unreasonable" because it will result in some otherwise-qualified voters being unable to cast a valid ballot solely because they fail to comply with the requirement. We will assume, as the League appears to

registry. *Id.* at 334–38. Under these circumstances, the court approved the rejection of ballots on the grounds that the unregistered voters had not completed, in sufficiently detailed fashion, "proper affidavits showing the facts" demonstrating that the potential voter was qualified to vote. *Id.* at 337. It was not enough, the court explained, that the voters were fully qualified to vote or that they may have completed "the only form of affidavit furnished and available to them on this occasion." *Id.* The court stated that it was "immaterial" whether the potential voters submitting the defective affidavits had appropriate forms of affidavits "at hand," presumably meaning available to potential voters at the polling place. *See id.* It was immaterial, "since it devolves on the elector to present proper affidavits showing the facts which entitle him to vote." *Id.* (citing authority that includes *Cothren*).

assume, that any such argument rests on a constitutional right to suffrage by qualified voters that derives from Article III. *See Gradinjan v. Boho*, 29 Wis. 2d 674, 684, 139 N.W.2d 557 (1966) (explaining that voting "is a constitutional right," based on Article III) (quoting *Ollmann v. Kowalewski*, 238 Wis. 574, 578, 300 N.W. 183 (1941)).

¶ 71. Given the language and reasoning of *Cothren*, it is not clear to us whether a separate constitutional "reasonableness" test should be applied to an Article III constitutional challenge like the one here. That is, under one possible reading of *Cothren*, given the legislature's legitimate and strong interest in the "purity" of the ballot box, the legislature may impose voter identification regulations that are onerous for potential voters to any degree, without violating Article III. However, we recognize a strong contrary argument that subsequent case law makes plain that any law, including a voter identification regulation, that "unreasonably" burdens the right of qualified voters to exercise their franchise is unconstitutional under Article III. In any case, we now explain why, assuming the existence of such a constitutional "reasonableness" test under Article III, the League fails to demonstrate that the photo identification requirement, *on its face*, fails the specific "reasonableness" standard articulated by the supreme court.

¶ 72. The constitutional "reasonableness" standard arises from cases that are not "additional qualification" cases, but that instead involve the right to suffrage under Article III, and is based on the significance of that right. *See State ex rel. Frederick v. Zimmerman*, 254 Wis. 600, 613, 37 N.W. 472 (1949) (right to vote "one of the most important of the rights

guaranteed to [the people] by the constitution"). The right of citizens to vote " 'is a right . . . subject to *reasonable* regulation by the legislature.' " *State ex rel. Shroble v. Prusener*, 185 Wis. 2d 102, 115, 517 N.W.2d 169 (1994) (quoting *Frederick*, 254 Wis. at 613) (emphasis added).

¶ 73. In *State ex rel. Wood v. Baker*, 38 Wis. 71 (1875), a candidate for local office alleged gross irregularities in election procedures pertaining to voter registration lists. *See id.* at 74, 83–85. *Baker* contains language that is plainly instructive as to a constitutional "reasonableness" standard.

> Statutes *cannot impair the right [to vote provided in the constitution], though they may regulate its exercise.* Every statute regulating it must be consistent with the constitutionally qualified voter's right of suffrage when he claims his right at an election. Then statutes may require proof of the right, consistent with the right itself. And such we understand to be the theory of the registry law; "to guard against the abuse of the elective franchise, and to preserve the purity of elections;"[10] *not to abridge or impair the right, but to require reasonable proof of the right.* It was undoubtedly competent for the legislature to provide for a previous registry of voters, as one mode of proof of the right; so that [the registry] should not be a condition precedent to the right itself at the election, but, failing the proof of registry, left other proof open to the voter at the election, consistent with his present right. So the legislature could provide for challenges of voters at the election, and for the oath or proof necessary to them to assert their right against challenge. And this we take to be the exact effect of the registry law as already construed by this court. If a voter's name be not on the register at an election, he is in effect challenged by the statute, and required to

[10] The court here quotes from the preamble to Chap. 445, General Laws, 1864.

furnish prescribed proof of his right. If there be no register at an election, the statutory challenge goes to all the voters; *they must furnish the requisite proofs of right.* These requirements are not unreasonable, and are consistent with the present right to vote, as secured by the constitution. The [registration] statute imposes no condition precedent to the right; it only requires proof that the right exists. *The voter may assert his right, if he will, by proof that he has it; may vote, if he will, by reasonable compliance with the law. His right is unimpaired; and if he be dis[en]franchised, it is not by force of the statute, but by his own voluntary refusal of proof that he is enfranchised by the constitution.*

*Id.* at 86–87 (emphasis added); *see also Dells v. Kennedy,* 49 Wis. 555, 559, 6 N.W. 246, 6 N.W. 381 (1880) (quoting the final two sentences of this passage in *Baker*).[11] We see in this extensive quotation a strong affirmation of the general rule of *Cothren* but also a statement that the requirement imposed must be "reasonable" in order to pass constitutional muster under Article III.

¶ 74. Also instructive is language from an opinion rejecting an argument, based on the constitution, that a residency requirement violated the voting rights of lumberjacks who roamed from job to job. The court explained:

---

[11] In concluding that the photo identification requirement is void, the circuit court in this case relied heavily on *Dells v. Kennedy,* 49 Wis. 555, 6 N.W. 246, 6 N.W. 381 (1880). However, as the League acknowledges in its briefing on appeal, to the extent that *Dells* stood for the proposition that the legislature may not establish a registration system that results in some qualified voters being unable to vote if they fail to comply with the system, revisions to Article III of the Wisconsin Constitution in 1882 and again in 1986 are superseding. In other words, the League effectively concedes that the focus in *Dells,* and what the court in *Dells* held to be "clearly unconstitutional," is no longer at issue and is now clearly constitutional. *See id.* at 560.

It is competent for the legislature to prescribe *reasonable* rules and regulations for the exercise of the elective franchise. To do so infringes upon no constitutional rights. It is because of the sacredness of the lawful use of the ballot, and of its importance in governmental affairs, that the right as well as the duty is vested in the legislature to prescribe *reasonable* rules and regulations under which it may be exercised. Such rules and regulations tend to certainty and stability in government and render it possible to guard against corrupt and unlawful means being employed to thwart the will of those lawfully entitled to determine governmental policies. Their aim is to protect lawful government, not to needlessly harass or disfranchise any one.

*State ex rel. Small v. Bosacki*, 154 Wis. 475, 478–79, 143 N.W. 175 (1913) (emphasis added); *see also Frederick*, 254 Wis. at 613 (observing that the right to vote is "subject to reasonable regulation by the legislature . . . . It is true that the right of a qualified elector to cast his ballot for the person of his choice cannot be destroyed or substantially impaired. However, the legislature has the constitutional power to say how, when, and where his ballot shall be cast . . . .").

¶ 75. Important for these purposes, the supreme court suggested a definition for the reasonableness of an election-related requirement in the course of upholding the constitutionality of an open primary statute in *State ex rel. Van Alstine v. Frear*, 142 Wis. 320, 125 N.W. 961 (1910). Citing Wisconsin precedent and other state authorities on the topic of permissible restrictions on candidates and on voters, the supreme court observed that these decisions "establish the rule that legislation on the subject of elections is within the constitutional power of the legislature so long as it merely regulates the exercise of the elective franchise and does not deny the franchise itself either directly or *by rendering its exercise so difficult and inconvenient as to amount to a*

*denial." Id.* at 341 (emphasis added). Among the cases cited in *Frear* for this proposition is *State ex rel. Runge v. Anderson,* 100 Wis. 523, 533–34, 76 N.W. 482 (1898), in which the court stated:

> Manifestly, the right to vote, the secrecy of the vote, and the purity of elections, all essential to the success of our form of government, cannot be secured without legislative regulations. Such regulations, within reasonable limits, strengthen and make effective the constitutional guaranties instead of impairing or destroying them. Some interference with freedom of action is permissible and necessarily incident to the power to regulate at all, as some interference with personal liberty is necessary and incident to government; and so far as legislative regulations are reasonable and bear on all persons equally so far as practicable in view of the constitutional end sought, they cannot be rightfully said to contravene any constitutional right.

*See also State ex rel. Barber v. Circuit Court for Marathon Cnty.,* 178 Wis. 468, 476, 190 N.W. 563 (1922) (citing *Frear* and *Anderson* with approval).

¶ 76. The League's implied argument that the photo identification requirement is constitutionally "unreasonable" on its face under Article III, even if it is not an "additional qualification," fails because the League makes no effective argument that, *on its face,* the requirement makes voting so difficult and inconvenient as to amount to a denial of the right to vote. As already explained, the League's argument that the requirement will result in some otherwise-qualified voters being unable to cast a valid ballot solely because they fail to comply with the requirement could be said of any number of indisputably facially valid voting regulations. This would include a requirement to register, a requirement to identify oneself at the polls in at least some fashion, and the general requirement to vote

at one's proper polling place, on the limited days and during the limited hours designated for voting.

¶ 77. The League also appears to argue that the photo identification requirement is constitutionally "unreasonable" on its face under Article III because it is more onerous than necessary. However, as we have explained, this is not the correct test. Simply "more onerous than necessary" does not, at least so far as the League presents its argument in this case, amount to proof that the requirement is "so difficult and inconvenient as to amount to a denial" of the right to vote. *See Frear*, 142 Wis. at 341. For this reason, the League fails to develop an argument under the correct legal test that the challenged provisions are constitutionally "unreasonable" on their face under Article III.

¶ 78. While we hope it is already clear from the above discussion, we emphasize that we do not mean to suggest that, assuming that the constitutional "reasonableness" test applies in this context, no identification requirement for potential voters that the legislature might enact could run afoul of either a facial or an as-applied challenge under Article III. Here, we conclude only that the League has not shown beyond a reasonable doubt that the photo identification requirement is, on its face, "so difficult and inconvenient as to amount to a denial" of the right to vote. *See id.*

¶ 79. In the end, both the League's argument as to why the photo identification requirement is, on its face, an unconstitutional "additional qualification," and the League's implicit argument that the requirement is constitutionally "unreasonable" under Article III, are not easy to pin down, particularly in light of its concessions. In any case, however, the League fails to make a persuasive argument under the correct legal test and

substitutes a nebulous "too onerous" test that lacks meaningful content in this facial challenge.

### 3. Legislature "Exceeded the Express Authority Granted to It"

¶ 80. We turn to the League's argument that, in requiring photo identification under Act 23, the legislature "exceeded the express authority granted to it" under the constitution. We conclude that the League's argument is unpersuasive, again based in part on concessions that we conclude are merited.

¶ 81. Pointing to the first of the *Dairyland* factors for constitutional analysis, which focuses on the text of the Article III implementation section, the League argues that the implementation section "defines the exclusive limits of legislative authority to enact laws implementing suffrage," and that the photo identification requirement does not "fall[] within one of the enumerated subjects" of the section. However, as explained above, the League separately, and inconsistently, acknowledges that the legislature possesses constitutional authority under the "providing for registration of electors" provision in Article III to create mechanisms to confirm voter identity at the polls as part of an effective ("full scope") voter registration system. Therefore, the League's plain meaning argument collapses in light of the concession.

¶ 82. Turning to the League's reliance on the second *Dairyland* factor, this focuses on constitutional debates and practices. The League points to legislative and ratification materials from the time of adoption of the current version of the Article III implementation section in 1986. From these materials, the League attempts to

demonstrate that the 1986 revisions were "intended to establish general suffrage . . . by removing provisions dictating who may not vote, replacing them with a broad provision specifying who is a qualified voter, and by providing the legislature with specifically constrained authority to enact laws limiting the right to vote."

¶ 83. However, even putting aside the fact that some of the materials the League quotes directly undermine its argument,[12] the League's bottom line propositions are vague and do not constitute proof of any point that matters to the analysis. For example, we readily agree that, generally speaking, the people of the state in 1986 favored "general suffrage," enlarging the franchise, and continuing to constrain legislative authority to enact laws limiting suffrage. However, none of those sweeping propositions advances any particular argument made by the League and therefore the propositions fall far short of showing that the photo identification requirement is facially unconstitutional beyond a reasonable doubt under Article III.

¶ 84. On a related note, the League's failure to develop a persuasive, relevant argument from the 1986 revision materials defeats its argument that the *Cothren* line of authority discussed above was "supersed[ed]" by the 1986 revisions.

¶ 85. Similarly, the League offers little under the third *Dairyland* factor, which involves the earliest in-

---

[12] The League quotes a 1979 legislative service agency note, which observed in part that the proposed revision "allows the legislature to adapt the state's laws to changes in federal law and state practice in providing for the extension *and limitation* of the right to vote *in specified areas*." (Emphasis added.) As discussed in the text, the League acknowledges that one "specified area" for legislative limitations on the right to vote is the area of creating reasonable methods aimed at identifying registered voters at the polls.

terpretations of the provision by the legislature as manifested through the first legislative action following adoption. The League cites 1985 Wisconsin Act 304, which addressed absentee voting, including Act 304's statement of policy, but the League points to nothing about Act 304 supporting its position. On the contrary, this material reflects at least one statement that, if anything, runs counter to the League's argument ("[t]he legislature finds that the privilege of voting by absentee ballot must be *carefully regulated* to prevent the potential for fraud or abuse") (emphasis added), and otherwise appears to stand for nothing relevant to the issues in this appeal.

¶ 86. In sum, the League fails to demonstrate beyond a reasonable doubt that the legislature lacked authority under Article III to enact the challenged provisions of Act 23.

### 4. Additional Arguments of the League

¶ 87. We now turn to additional arguments advanced by the League. A large number of these arguments fail because they are inconsistent with its concessions discussed above, and we do not catalog all of these arguments. They include the following:

- The League argues that the constitution could have been, but was not, amended in 1986 to explicitly grant the legislature authority to enact laws allowing officials to ascertain voter qualifications. Any argument that this matters is again contrary to the concession about legislative authority in this area.

- The League argues that (1) "the poll book" and "not the display of ID" "shows election officials that a voter is qualified to vote" and that, (2) under the constitution, the "voter registration laws" provide "a

wholly sufficient means of ensuring that electors are constitutionally qualified." These arguments are especially puzzling, because they appear to rest on the premise that the legislature is without authority to create any laws for the purpose of ascertaining the identities of potential voters at the polls, contrary to the League's concessions.

Similarly, the circuit court rested its opinion, in part, on the premise that "Act 23's photo ID requirements do not fall within any of the[] five categories" of the Article III implementation section. However, as we have explained, under the League's concession as to legislative authority, the requirement falls within the subsection of Article III allowing the legislature to pass laws providing for a system of registration and, necessarily, give effect to the registration requirement by providing for some means of verifying at the polling place that a person seeking to vote is registered.

¶ 88. The League makes an extensive argument based on language from *Baker*, language that we have already quoted above at ¶ 73. The following are the most relevant portions for purposes of the League's argument:

It was undoubtedly competent for the legislature to provide for a previous registry of voters, as one mode of proof of the right; *so that [the registry] should not be a condition precedent to the right itself at the election, but, failing the proof of registry, left other proof open to the voter at the election, consistent with his present right.* So the legislature could provide for challenges of voters at the election, and for the oath or proof necessary to them to assert their right against challenge . . . . *The [registration] statute imposes no condition precedent to the right; it only requires proof that the right exists.* The voter may assert his right, if he will, by proof that he

758

> has it; may vote, if he will, by reasonable compliance
> with the law. His right is unimpaired; and if he be
> dis[en]franchised, it is not by force of the statute, but
> by his own voluntary refusal of proof that he is enfran-
> chised by the constitution.

*Baker*, 38 Wis. at 86–87 (emphasis added).

¶ 89. The League argues that the first of the two italicized statements stands for the proposition that "statutes 'regulating' the right to vote may not impose a 'condition precedent' that deprives a qualified elector of his right to suffrage on the day of the election," and that the photo identification requirement in Act 23 represents such an unconstitutional "condition precedent."

¶ 90. One difficulty with the League's argument is that the first emphasized passage, when read in context, appears to be descriptive and not prescriptive. That is, the court appears to be merely describing the actual operation of the registry statute then in place, not prohibiting such a mechanism.

¶ 91. Regardless, the League's argument ignores the second emphasized passage, which states in clear terms that requesting proof that a potential voter is listed on what is now called a poll list is not an impermissible "condition precedent." The second passage unambiguously acknowledges that "voluntary refusal of proof" might result in a potential voter not being able to cast a valid vote; the potential voter is to be viewed as having "disenfranchised" himself or herself by choice. On that basis alone, it is difficult to take the first italicized passage as standing for the proposition advanced by the League.

¶ 92. Further, there is a larger difficulty with the League's argument, one that goes to a central weakness in the League's arguments generally. Even if the first italicized passage could be taken to suggest that *some*

759

requirements involving identification of voters at the polls would be unconstitutional on their face under *Baker*, the League does not explain or derive from the language of *Baker*, or from any other authority, a reason for us to conclude that the photo identification requirement at issue here is unconstitutional on its face under Article III.

¶ 93. In sum, the League has presented no basis to conclude that it has met its heavy burden in this facial constitutional challenge.[13]

## CONCLUSION

¶ 94. For these reasons, we reverse the circuit court's summary judgment granting declaratory and injunctive relief to the League and remand for further proceedings consistent with this opinion as may be necessary.

*By the Court.*—Judgment reversed and cause remanded.

---

[13] Because we conclude that the state officials prevail on the merits, we do not address the state officials' challenge to the circuit court's conclusion that the League and its president have standing to bring this action. We assume standing without deciding the issue. *See McConkey v. Van Hollen*, 2010 WI 57, ¶ 15, 326 Wis. 2d 1, 783 N.W.2d 855 ("standing in Wisconsin is not a matter of jurisdiction, but of sound judicial policy"); *see also State v. Castillo*, 213 Wis. 2d 488, 492, 570 N.W.2d 44 (1997) (appellate courts need not address non-dispositive issues). Because the state officials prevail on the merits, we also do not address the suggestion of intervenors that the circuit court's decision violates federal constitutional law by imposing an unconstitutional limitation on safeguards intended to protect the integrity of federal elections.